IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| WILLIAM T. DAVIS | * | |
| Plaintiff | * | |
| v. | * | Case No.: 1:05CV01358 |
| GABLES RESIDENTIAL/ H.G. SMITHY | * | Court date: 9/6/07 Status Hearing |
| | * | Judge Colleen Kollar-Kotelly |
| Defendant | | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

### DEFENDANT'S STATEMENT OF MATERIAL FACTS NOT GENUINELY AT ISSUE

Gables Residential Services, Inc., Defendant, by KARPINSKI, COLARESI & KARP and DANIEL KARP, its attorneys, pursuant to United States District Court for the District of Columbia Local Rule 7(h), hereby submits the following statement of material facts as to which there is no genuine issue, in connection with Defendant's Motion for Summary Judgment, filed herewith.

Plaintiff, William Davis (hereinafter "Plaintiff") was employed by Gables Residential Services, Inc. (hereinafter "Gables") as assistant chief engineer at Marbury Plaza apartment complex, where Gables carries on a regular course of business, at 2300 Good Hope Road SE, Washington, DC. (Deposition of William T. Davis, attached to the Memorandum in Support of Motion to Dismiss, which is filed herewith, as Exhibit 1, p. 25, lines 6 – 18). He was terminated by the property manager, Deandra Fooks, who (1) was very uncomfortable attempting to supervise Plaintiff after the end of an intimate

1

relationship between them and after Plaintiff had publicly challenged her business decisions, and (2) was not one of the persons involved with Plaintiff's EEOC claim of three years before. Plaintiff's employment was terminated after he criticized the chief engineer, Maurice Williams, for his choice of employee-of-the-month, and Mr. Williams threatened to resign if Plaintiff remained in Gables' employ. Mr. Williams (1) was not one of the persons involved with Plaintiff's prior EEOC claim, and (2) was the individual who chose to promote Plaintiff to assistant chief engineer after the prior EEOC claim. (Id., p.27, lines 7 - 13). Plaintiff himself avers that a substantial reason for his termination was Ms. Fooks' discomfort attempting to supervise him. (Id., p. 48, lines 2 - 9). He recognizes that Ms. Fooks fired him because she did not like him, and because both she and Mr. Williams found working with him very unpleasant. (Id., p. 82, lines 11-15).

I.  **The Circumstances of Plaintiff's Termination Demonstrate Legitimate Business Reasons for the Termination.**

The only discriminatory action alleged by Plaintiff is his termination on July 7, 2003. On that date, Plaintiff's at-will employment was terminated by Ms. Fooks, the property manager. (Id., p. 52, lines 7 - 14; p. 48, line 16 to p. 49, line 1). Ms. Fooks informed Plaintiff that she was terminating him for insubordination, because Plaintiff had started an argument with his supervisor, Mr. Williams, a few days earlier. (Id., p. 49, lines 2 - 14). Plaintiff argued with Mr. Williams because he disagreed with his decision to name a certain employee as employee of the month:

> Q.    Tell me, if you would, about your encounter with Mr. Williams having to do with this employee of the month issue. What happened?

2

> A. Well, the employee of the month was picked by Ms. Fooks. She used to pick the employee of the month. This time – we'd have a monthly meeting and at that time, Ms. Fooks would say the name of the employee of the month and she'd give him – I think the check was $200, I believe.
> At that time Ms. Fooks, for whatever reason, told us I'm not going to name the employee of the month this month. Maurice is, Maurice Williams. So he said, he gave the check to Tyrone Moore. Now during that month he got it for, he was written up once.
>
> Q. "He" being Tyrone?
>
> A. Right, and threatened a write-up at another time because he wasn't answering his calls. He would not go to his calls. The only calls he would go on were the lock-outs. He had 17 calls, he went to three. The three he went to were lock-outs. We got paid for lock-outs. The tenants had to give us $25 check or cash before we let them in. That's the only calls he went on.
> So when Maurice gave him that, I didn't say anything in the meeting. I waited till me and Maurice were outside of the meeting. I asked him, what did you give him that for? He didn't deserve that. Him and Maurice, they go out together, they went to strip clubs together and everything like that. I knew what it was but I asked him. He told me he didn't have to answer anything that I said.
> And when I kept on, he asked me, he said, why don't you stop crying? He said, you want some tissue? That's what he asked me and I got upset at him. But I never – what they said I said, I'll kick your behind all around here, and I'll put my foot here and MF this and MF that. ...
> It was all fabricated just to get rid of me. It was all personal. Even with employment-at-will, I can understand if you own your company and you don't like that personality, get him out of there. But if she's your employee and you don't even know nothing about it, if she fires me because she doesn't like me. That's not employee-at-will as far as I understand. When they fired me, it was for their own personal reason. It had nothing to do with the betterment of the company. It was because both of them were uncomfortable having me around.

(Id., p. 80, line 7 to p. 82, line 15). Accounts of the argument differ, but it was admittedly loud, and Plaintiff used abusive language. (Id., p. 84, line 3 to p. 84, line 17; p. 89, line 11 to p. 90, line 9).

3

Plaintiff states that on the day of his termination, Mr. Williams stated that if Plaintiff were not terminated by the end of the day that he was going to resign. (Complaint, p. 3) ("I believe I was fired not because of my conduct, but because Mr. Williams threatened to resign if I were not fired by the days end."). Plaintiff testified that the chief engineer's threat to quit put pressure on the manager to fire Plaintiff:

> Q. Were there any other reasons for the discharge, in your opinion, other than the four categories of reasons that you've mentioned?
>
> A. Yes, when the incident happened – the incident happened between me and the chief engineer, he told two of the maintenance guys that he went there after the incident happened, he went down to the maintenance shop and told – as a matter of fact, he told the entire crew that if I wasn't out of there by the end of the day, he was going to quit. And I believe that also put pressure on the manager because he's the chief engineer and the chief engineer is like a chef in the kitchen. Without him, you don't have a kitchen. Without chief engineer, you can't even – you're in violation of codes if you don't have one down there.
>
> Q. The chief engineer was Maurice Williams?
>
> A. That was his title. He wasn't an engineer because he didn't have a license. That was the title that he used.
>
> Q. Was the person to whom you were referring Maurice Williams?
>
> A. Yes.

(Exhibit 1, Deposition of William T. Davis, p. 18, line 4 to p. 19, line 3). Thus, one of the explanations that Plaintiff offers for his termination is that it was a business decision to retain the chief engineer, Mr. Williams, rather than the assistant chief engineer, when the working relationship between them was so unpleasant that they could not both be retained.

4

In his deposition, Plaintiff testified that another reason for his discharge was that the property manager, Ms. Fooks, was uncomfortable supervising him after he publicly disrespected her authority and caused an end to their intimate relationship in April 2003, three months before she fired him. (Id., p. 46, line 5 to p. 47, line 2). Plaintiff's challenge to Ms. Fooks in the presence of other people brought an acrimonious end to their romantic relationship and brought Ms. Fooks to the brink of quitting:

> Q. Why did your relationship fall apart?
>
> A. Well, she said it was because I didn't back her or whatever. She thought that I was – because I asked her, I questioned her about some things as far as the maintenance techs were concerned, about getting us equipment and things like that and I did it in front of people, and she felt like since we had that kind of relationship or friendship that I shouldn't have done that. And she took it really personal.
>
> As a matter of fact, she quit that day. She walked into her office, she packed up everything she had, her pictures, all her personal effects and told everybody, I'm out of here, this is my last day and left.

(Id., p. 47, lines 3 - 15). Plaintiff admitted that one reason for Ms. Fooks' decision to terminate him was that she was uncomfortable supervising him after this incident:

> Q. She's the one who fired you in July?
>
> A. Yes. It was very uncomfortable having me around because some of the maintenance techs and things – she had questioned how she would be able to discipline me with our relationship. When our relationship ended, I believe that **it made her very, very uncomfortable** which may have not been the primary reason that she fired me, but **I think that that has a lot to do with her decision**.

(Id., p. 48, lines 1 - 9) (emphasis added). The context of Plaintiff's retaliation claim is that Plaintiff had made the working environment so unpleasant that Mr. Williams and Ms. Fooks each reacted to his challenging their authority by threatening to quit.

5

**II.    The Alleged Basis for Plaintiff's Federal Title VII Discrimination Claim.**

Notwithstanding his history of arguing with both his property manager and his supervisor to the point where both of them considered quitting rather than continuing to work with him, Plaintiff claims that his termination was unlawful retaliation for Title VII protected activities years before. In November 1999, Plaintiff had been terminated from his employment by Mr. Jurney of Gables' predecessor firm, H.G. Smithy, and on December 8, 1999, he filed an EEOC charge regarding that termination. (Id., p. 20, line 12 to p. 24, line 1; p. 23, lines 11 - 18). The EEOC complaint was settled through mediation on February 9, 2000. (Id., p. 21, line 8 to p. 22, line 5). Plaintiff was reinstated with H.G. Smithy. (Id., p. 21, line 15 to p. 22, line 1). Only his place of work was changed to Marbury Plaza. (Id.).

More than two and a half years later, in November 2002, Gables took over the management of Marbury Plaza from H.G. Smithy. (Id., p. 20, lines 12 - 17). After Gables became the management employer, Plaintiff was retained, but Mr. Jurney, the individual who had fired Plaintiff in 1999, was not. (Id., p. 24, lines 13 - 18). Shortly after Gables took over, Maurice Williams was hired as chief engineer (Id., p. 26, line 2 to p. 28, line 20), and became Plaintiff's supervisor (Id., p. 89, lines 17 - 20, p. 90, lines 3 – 6). He promoted Plaintiff to the position of assistant chief engineer. (Id., p. 27, lines 7 - 13). Ms. Fooks also become property manager on a date after Plaintiff's EEOC claim; she was not the property manager when Plaintiff first went to Marbury Plaza. (Id., p. 45, lines 7 - 13). Thus, Plaintiff's Title VII claim is that his discharge by Ms. Fooks, the property manager of Gables, as urged by Mr. Williams, his supervisor, was in retaliation for Plaintiff's

bringing an EEOC charge against a different employer, H.G. Smithy, more than three years earlier, at a time before either Ms. Fooks or Mr. Williams knew or worked with Plaintiff.

### III. Plaintiff Failed to File an EEOC or DCOHR Claim.

Plaintiff did not file any EEOC Charge of Discrimination relating to this Title VII retaliation claim. Plaintiff claimed in his deposition that "There was none made." (Exhibit 1, Deposition of William Davis, p. 42, line 1). Plaintiff testified that the EEOC told him it could not handle his claim for retaliation because too long a period, more than two and a half years, had lapsed. (Id., p. 43, lines 1 – 7). Nor did he file a charge of discrimination with the local agency with jurisdiction to grant relief for employment discrimination, the DCOHR. (Id., p. 43, lines 8 - 10). Plaintiff never availed himself of his administrative remedies.

Plaintiff testified that he did not file a charge of discrimination with the EEOC, but believes that he filed a charge of "wrongful termination":

> Q. Let me jump ahead to a slightly different topic, and that is the second charge of discrimination you filed against my client.
>
> A. I didn't file a charge of discrimination, I filed a charge of wrongful termination.

(Id., p. 38, line 19 to p. 39, line 1). The evidence that Plaintiff offered of the charges he had brought was a copy of a Charge Questionnaire which is date-stamped July 21, 2003, by the Washington Field Office of the EEOC, a copy of which is attached to the Memorandum in Support of Motion to Dismiss, filed herewith, as Exhibit 2.

> Q. And as you will have heard me just say, the document we're looking at says Charge Questionnaire. It is not a charge of discrimination. I'm

7

>   looking for a document that says charges of discrimination or something of the sort pertaining to July 2003.
>
> A.  Can I see the second page of that? Right here. It says right here, date filed, and it's stamped on the front with the EEOC stamp and that's the date I filed. That's what it says, filed.

(Id., p. 40, line 17 to p. 41, line 3). Plaintiff testified that he did not in fact bring a charge of discrimination with the EEOC:

> Q.  . . . My Question is based on the fact that as far as I can tell, you filled out a questionnaire in July 2003, but I don't have a charge of discrimination document which is the document that is given to the employer.
>
> A.  There was none made. They said that was not in their realm. It was not discrimination. If anything, it was wrongful termination. That's when I took the other legal course.

(Id., p. 41, line 19 to p. 42, line 4).

The evidence demonstrates that Plaintiff did not file charges regarding his Title VII claims with either the EEOC or the DCOHR. Accordingly, the Title VII discrimination claim is time-barred.

**IV.    Plaintiff's District of Columbia Common Law Wrongful Discharge Claim.**

**A.    Internal Complaints about Boiler Technicians and Asbestos.**

Plaintiff apparently believes that another reason for his termination was that he complained "about the safety factor involving maintenance techs working on boilers without training or licensing," (Complaint, p. 2), and "about my exposure to hazardous materials (i.e. asbestos) without the benefit of training or protective covering" (Id.). Plaintiff testified that he and the rest of the maintenance crew made internal complaints about exposure to hazardous materials at work, including lead and asbestos, and

8

requested protective clothing and training. (Exhibit 1, Deposition of William Davis, p. 13, line 16 to p. 14, line 7; p. 45, line 1 to p. 46, line 4). They spoke to Ms. Fooks and to the chief engineer, Mr. Williams. (Id.). Plaintiff never submitted his requests in writing. (Id., p. 32, lines 12 - 19).

Plaintiff did not refuse to violate the law, refuse to do as he was asked to do, or refuse to violate a public policy; nor was his termination because of his refusal to comply with a request to break the law or to violate a public policy. His alleged complaints did not implicate any public policy based on a statute or regulation that reflects the particular public policy to be applied.

There is no basis for a factual finding that Plaintiff's complaints were linked to his termination. Plaintiff's internal complaints were not distinguishable from the complaints of other maintenance employees. He testified, "I made numerous complaints – not only me. The rest of the maintenance crew, we made numerous complaints to both Ms. Fooks and Mr. Maurice Williams ... concerning our exposure to hazardous materials ...." (Id., p. 13, line 17 to p. 14, line 1). When asked more specific questions about the complaints to Ms. Fooks, the manager who terminated him, Plaintiff clarified that he had not in fact made any complaints to her:

> Q.  You made these complaints and requests to Ms. Fooks?
>
> A.  I made it to the chief engineer and he said he was going to talk to Ms. Fooks. Whether he actually talked to her, I don't know.
>
> Q.  The question was whether you yourself made any such requests or complaints to her.
>
> A.  I talked to her about it, yes. It wasn't in the form of a complaint but I did talk to her about it.

9

> Q. What form was it?
>
> A. Well, we had a relationship that was more than employee/employer or supervisor, so I did it on off time. We weren't on duty at the time.

(Id., p. 45, line 14 to p. 46, line 4). Thus, Plaintiff made the same internal complaints as his co-employees, but did not make complaints directly to management. Plaintiff was not terminated solely or substantially for engaging in alleged whistleblowing conduct.

**B.    Allegation of a Call to the Wage and Hour Board.**

Plaintiff in his deposition alleged a factual basis for his claim of wrongful discharge that was not mentioned in his Complaint. He stated that he believed a complaint which he made to the Wage and Hour Board was also a reason for his termination. (Id., p. 55, lines 2 - 8). He allegedly telephoned a complaint about an alleged practice of "Chinese overtime" and about payment for on-call time. (Id., p. 57, line 3 to p. 58, line 14.) He was informed that his complaint would be investigated, and the next day was told that the Board had called the company and the company was "within their rights." (Id., p. 59, line 11 to p. 60, line 5).

It appears that the call was made on or about January 14, 2003, six months before his termination.

> Q. You're showing me an authorization dated February 3, 2003 which is, of course, before the date you were fired and that authorization allowed you to –
>
> A. It allowed the Employment Administration to use my name because they ask you if you want to be anonymous or not. I told them yes, they could use my name.

> Q. What it actually says is authorized to use your name and information in your statement of January 14, 2003. Do you have a statement of January 14, 2003 among your paperwork?
>
> A. No, because I made a statement on the phone.

(Id., p. 61, lines 2 - 14). No member of management at Gables knew of Plaintiff's telephone call to the Wage and Hour Board. There is evidence only that Plaintiff had authorized his name to be released, not that it was given to Gables' management. Nor did any member of management mention Plaintiff's Wage and Hour Division call:

> Q. Did anybody associated with management at Gables say anything to you that led you to conclude that your July 2003 termination was related to your complaints to the Wage and Hour Division?
>
> A. There was an offhand remark. It wasn't direct. When I made complaint to Mr. Williams once, he asked me, listen, do you want to work here? If you're not happy working here, you can just, you know, we can remedy that or something to that effect which, to me, was saying if you don't stop, we're going to fire you.
>
> Q. Did he reference your complaints to Wage and Hour in particular as opposed to your complaint about lead and asbestos and this and that?
>
> A. No, **I was considered by Mr. Williams and most of the managers as a trouble maker** because I made complaints about things. You know, there were a number of things. They had a book that said, gave hours of how long it should take for you to do a certain job and if you spent – if they put down you take between one and two hours on that job and you put down four hours, they just wouldn't pay you. I stopped that. That was illegal too.
> Everything I complained about was illegal. It was just that **I wasn't considered what they call a team player.**

(Id., p. 62, line 12 to p. 63, line 14) (emphasis added).

The substance of Plaintiff's allegation is that he believes that an additional fact outside of the allegations in the Complaint, a call to the Wage and Hour Division of the Department of Labor, may have contributed to Defendant Gables' reasons for terminating

11

him. Plaintiff telephoned to the Wage and Hour Division in January 2003 and gave permission to use his name in connection with their investigation. The next day he was contacted and told that his complaint had been investigated and closed. His name was not given to any member of Gables management, and the company was not informed of his call. In sum, there is no reason apart from pure surmise and conjecture to believe that Plaintiff's call to the Wage and Hour division was connected in any way to his termination.

Plaintiff's allegations of his calls concerning Wage and Hour Division matters of pay or compensation at Gables are not mentioned at all in the Complaint. They are not related in any way to the alleged whistleblowing that is referenced in the Complaint. As Plaintiff's termination occurred more than four years ago, an action for wrongful discharge on the basis of Plaintiff's alleged Wage and Hour Complaint would now be outside of the three-year statute of limitations for a general tort.

C.      **Reference to a Call to OSHA.**

Another factual allegation that was given brief mention in the Complaint was that Plaintiff had called the Occupational Safety and Health Administration ("OSHA"). (Complaint, p. 3). The details of the call are not set forth in the Complaint. The Complaint only states, "I believe I was fired not because of my conduct, but because Mr. Williams threatened to resign if I were not fired by the days end. Also, retaliation for past actions (i.e. reporting them to EEOC and winning my case, calling OSHA[)]." (Complaint, p. 3). There is no further reference in the Complaint to any call or complaint to OSHA.

In his deposition, Plaintiff alleged that he placed two calls to OSHA on one day and complained about his exposure to asbestos and lead (Exhibit 1, Deposition of William T. Davis, p. 67, line 2 to p. 68, line 6). On "both occasions, whoever answered the phone, the gentleman who answered the phone said – he looked at his file and said, well, we were out there last year or a couple months ago and everything was fine, they passed the inspection." (Id., p. 14, line 19 to p. 15, line 2).

Plaintiff did not allege that he told any member of management about the alleged calls to OSHA. There is no evidence that OSHA contacted Gables in response to Plaintiff's calls or that there was any subsequent investigation or communication from OSHA which might have alerted management to Plaintiff's complaint. Plaintiff did not inform any of his supervisors or management about his complaint to OSHA or discuss it with any member of Gables' management. Furthermore, Plaintiff testified that the calls to OSHA were made in late 2003. (Id., p. 67, lines 16-18). Thus, the evidence shows that the day of Plaintiff's calls to OSHA was after the date of his termination on July 7, 2003.

In short, the evidence, in particular Plaintiff's testimony, shows that he was terminated on the basis of his repeated criticisms and challenges of his superiors at his workplace. He was terminated at the urging of Mr. Williams, the same man who had promoted him to assistant chief engineer, after Plaintiff found fault with Mr. Williams' choice of employee of the month and chose to argue with him about his decision. While it is not disputed that Plaintiff filed an EEOC charge years before his termination, the individuals who fired him were not involved in the prior charge and Gables was not his employer then. Moreover, Plaintiff failed to pursue his administrative remedies for

13

employment discrimination in a timely manner, and is barred from bringing a Title VII claim at this time.  Plaintiff's alternative claim of wrongful discharge under District of Columbia common law is not supported by evidence that Plaintiff engaged in protected activity that makes out a public policy exception to employment at-will.  Nor is there evidence from which a reasonable fact-finder could find that protected activity was the sole or substantial reason for his termination.

         Respectfully submitted,

         KARPINSKI, COLARESI & KARP


BY:   _____/s/_____
    DANIEL KARP, Bar ID# 424246
    120 East Baltimore Street, Suite 1850
    Baltimore, Maryland 21202
    410-727-5000
    *Attorneys for Defendant Gables Residential Services, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of July 2007, a copy of the foregoing Defendant's Statement of Material Facts Not Genuinely at Issue was electronically filed and sent by first class mail, postage prepaid, to:

William T. Davis
3501 Pacific Avenue
Apartment 89
Atlantic City, New Jersey 08401

                                                               /s/
                                         Of Counsel for Defendant